ANGLO–DUTCH PETROLEUM IN-
TERNATIONAL, INC., and Anglo–
Dutch (Tenge) L.L.C., Petitioners,

v.

GREENBERG PEDEN, P.C.,
and Gerard J. Swonke,
Respondents.

No. 08–0833.

Supreme Court of Texas.

Argued Sept. 14, 2010.

Decided Aug. 26, 2011.

Rehearing Denied Dec. 16, 2011.

Gregory S. Coleman, Richard Bernard Farrer, Yetter Coleman LLP, Craig T. Enoch, Enoch Kever PLLC, Mike A. Hatchell, Charles R. 'Skip' Watson Jr., Locke Lord Bissell & Liddell, LLP, Austin, TX, Donald B. McFall, Kenneth R. Breitbeil, McFall, Breitbeil & Smith, P.C., Brian K. Tully, Jesse R. Pierce & Associates, P.C., Houston, TX, for Anglo–Dutch Petroleum International, Inc.

Rusty Hardin, Joe M. Roden, Ryan Kees Higgins, Rusty Hardin & Associates, P.C., Robert M. 'Randy' Roach Jr., Daniel William Davis, Roach & Newton, L.L.P., Houston, TX, Amy J. Schumacher, Roach & Newton, L.L.P., Austin, TX, for Greenberg Pede, P.C.

Linda Eads, Dedman School of Law, Dallas, TX, pro se.

Christopher S. Johns, Dawson Sodd Ellis & Hodge LLP, Austin, TX, for Amicus Curiae Abrams Scott & Bickley, L.L.P.

Justice HECHT delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice JOHNSON, Justice WILLETT, and Justice GUZMAN joined.

The parties dispute whether an attorney fee agreement is ambiguous. The client contends that an agreement on law firm letterhead, signed by a lawyer on behalf of the firm, is with the firm, not with the lawyer personally. The lawyer counters that his use of personal pronouns in the agreement, as well as surrounding circumstances, create an ambiguity that must be resolved by a jury. We agree with the client and therefore reverse the judgment of the court of appeals.[1]

I

Scott V. Van Dyke, president of Anglo–Dutch Petroleum International, Inc., asked Gerard J. Swonke, a lawyer "of counsel" with the firm of Greenberg Peden, P.C., to represent Anglo–Dutch as plaintiff[2] in a

---

1. 267 S.W.3d 454 (Tex.App.-Houston [14th Dist.] 2008).

2. An affiliate, Anglo–Dutch (Tenge) L.L.C., was also a plaintiff and is a petitioner here,

suit against Halliburton Energy Services, Inc. and Ramco Oil & Gas, Ltd. for disclosing confidential information concerning the development of oil and gas prospects in the Tenge Field in Kazakhstan. Greenberg Peden had represented Anglo–Dutch on various matters for years and had drafted the confidentiality agreement that would be central to the suit. Swonke had been responsible for Anglo–Dutch's initial engagement as a firm client and had done much of its work. He and Van Dyke were friends.

The Tenge Field case was expected to be protracted and difficult, and Anglo–Dutch could not afford to pay Greenberg Peden's hourly rates, as it had done in the past, so it proposed a 20% contingent fee. The firm declined. Anglo–Dutch had fallen behind in its obligations to the firm, and the firm had decided not to accept further business from Anglo–Dutch until it became current. Plus Greenberg Peden believed that it lacked the resources needed to prosecute the case on a contingent-fee basis. Swonke referred Van Dyke to another firm, McConn & Williams, which took the case.

But Swonke's continued counsel, based on his involvement in the events leading up to the litigation, was still needed, and Van Dyke asked him to assist McConn & Williams, again for a contingent fee. Swonke's arrangement with Greenberg Peden required him to offer new business to the firm; if the firm refused, Swonke could undertake the representation individually. Swonke used personal stationery—"Law Offices of Gerard J. Swonke Attorney at Law"—and signed individually when representing clients who were not also clients of the firm. Even in those situations, the firm sent the bills and retained ten percent of the fees. Swonke agreed to Van Dyke's proposal and dictated the following agreement ("the Fee Agreement"), which his secretary prepared on firm letterhead and he signed on its behalf:

GREENBERG PEDEN P.C.

TELEPHONE: (713) 627–2720

FACSIMILE: (713) 627–7057

WEBSITE: www.gpsolaw.com

ATTORNEYS AND COUNSELORS AT LAW

TENTH FLOOR, 12 GREENWAY PLAZA HOUSTON, TEXAS 77046

October 16, 2000

Mr. Scott V. Van Dyke

Anglo–Dutch Petroleum International, Inc.

Eight Greenway Plaza, Suite 900

Houston, Texas 77046

Re: Cause No.2000–22588; *Anglo–Dutch (Tenge) et al. v. Ramco, et al.;* In the 151st Judicial District of Harris County, Texas.

Dear Scott:

This letter memorializes our agreement with respect to me assisting you and/or the companies which you control (Anglo–Dutch) and the law firm of McConn & Williams, LLP regarding the above-referenced matter.

In that regard, you have executed a Fee Agreement with the law firm of McConn & Williams on March 25, 2000, which is incorporated herein by reference. I agree to assist Anglo–Dutch and that firm with this lawsuit for proportionately the same percentage (20%) of any benefit to McConn & Williams reflected in such agreement. However, I will not be responsible for any expenses other than those I may personally incur. Further, the proportions under which my fees shall be calculated will be the ratio

wholly aligned with Anglo–Dutch Petroleum International, Inc.

of the hours I have spent or will spend on this matter relative to the hours the attorneys at McConn & Williams have spent or will spend after the date the lawsuit was filed, rounded to the next whole percentage. For example, if McConn & Williams' attorneys spend 1,000 hours on the lawsuit after the date the lawsuit was filed and I spend 90 hours of my time towards the lawsuit, then by rounding up to the nearest whole number, I would be entitled to receive from you 2% (10% of 20%) of the gross revenues and other benefits recovered, if any, from this lawsuit. In addition, should the Fee Agreement be amended, you agree that I shall be entitled to the benefit of such amendment. If this comports with your understanding of our agreement, please indicate by signing below and returning this letter to me.

If you have any questions, please contact me.

Very truly yours,

GREENBERG PEDEN P.C.

/s/ *G.J. Swonke*

GERARD J. SWONKE

AGREED TO:

SCOTT V. VAN DYKE, PRESIDENT OF

ANGLO–DUTCH PETROLEUM INTERNATIONAL, INC.

DATED:_____

The next day, Van Dyke signed the agreement and returned it to Swonke. He also wrote Swonke the following letter:

ANGLO–DUTCH PETROLEUM INTERNATIONAL

EIGHT GREENWAY PLAZA, SUITE 900

HOUSTON, TEXAS 77046

UNITED STATES

TEL: (713) 993–9303

FAX: (713) 993–9011

email@anglo-dutch.com

October 17, 2000

Mr. Gerard J. Swonke

Greenberg Peden P.C.

Tenth Floor

12 Greenway Plaza

Houston, TX 77046

Re: McConn & Williams, LLP Attorney's Employment Agreement

Dear Jerry:

Pursuant to our Fee Agreement dated October 16, 2000, please find enclosed a copy of the executed Attorney's Employment Agreement with McConn & Williams, LLP related to Cause No.2000–2258; *Anglo–Dutch (Tenge) et al. Vs. Ramco, et al.;* in the 151st Judicial District of Harris County Texas.

This fee agreement with McConn & Williams, LLP provides the basis for the Agreement between Greenberg Peden P.C. and Anglo–Dutch.

Very truly yours,

/s/ *Scott Van Dyke*

Scott V. Van Dyke

President

Of significance is Van Dyke's reference to the Fee Agreement as "the Agreement between Greenberg Peden P.C. and Anglo–Dutch." Swonke received the letter but did not read it and thus did not respond.

Swonke continued to work on the case, and as provided by the Fee Agreement, Greenberg Peden invoiced Anglo–Dutch for expenses. But a year later, Greenberg Peden dissolved, and Swonke moved to McConn & Williams, again in an "of counsel" relationship. In a letter to Van Dyke, Swonke wrote that he would not take the Anglo–Dutch files with him if Van Dyke

objected.[3] Van Dyke did not. Swonke continued to work on the Tenge Field case at McConn & Williams as did other lawyers, including two who were also "of counsel".

As the litigation wore on, Anglo–Dutch and McConn & Williams decided to retain additional counsel, and they hired John M. O'Quinn & Associates. McConn & Williams reduced its 20% fee to 16-2/3%, and Anglo–Dutch agreed to pay O'Quinn 20%, for a total contingent fee of 36-2/3%. Still later, Anglo–Dutch agreed to pay the fee net of expenses. The case was tried to a plaintiffs' verdict and then settled for $51 million. Anglo–Dutch's legal fees and expenses totaled slightly over $20 million.

A few days before the settlement was funded, Swonke told Van Dyke that he expected to be paid under the Fee Agreement not only for the 277 hours he worked while at Greenberg Peden but also for 1,022 hours he worked at McConn & Williams. All the other lawyers at McConn & Williams were to be paid under the firm's agreement with Anglo–Dutch. Greenberg Peden assigned its interest in the Fee Agreement to Swonke. The assignment, which Swonke prepared and signed, recited that "Swonke executed [the Fee Agreement] on behalf of (and while affiliated with) Greenberg Peden as an Of Counsel". Van Dyke offered to pay $293,338.85 for Swonke's work on the case while at Greenberg Peden but refused to pay for the time spent by Swonke at McConn & Williams.

Anglo–Dutch sued for a declaration that the Fee Agreement was with Greenberg Peden, not Swonke personally. It also sued Swonke for breach of fiduciary duty. Swonke counterclaimed for breach of contract, asserting that he personally was party to the agreement. Swonke also alleged that Van Dyke had defrauded him. Based on Swonke's testimony that his use of firm letterhead and the firm signature block, and his characterization of the agreement in the assignment, were mistakes, and extrinsic evidence of the parties' relationship, the trial court concluded that the agreement was ambiguous and submitted the parties' dispute to the jury. The jury found that the Fee Agreement was with Swonke, that Swonke had complied with his fiduciary duty to Anglo–Dutch, and that his damages were $1 million. The jury failed to find that Van Dyke had defrauded Swonke. The trial court rendered judgment on the verdict, and the court of appeals affirmed.[4]

We granted Anglo–Dutch's petition for review.[5]

## II

We begin by considering what standards to apply in construing lawyer-client contracts. We then apply those standards to the Fee Agreement, first to its text, and then to the circumstances surrounding its execution.

### A

■■■ " 'Whether a contract is ambiguous is a question of law that must be

---

**3.** Swonke wrote to Van Dyke on November 6, 2001: "For many years, I have had the pleasure of representing you and your interests through my association with Greenberg Peden, P.C. However, recently Greenberg Peden, P.C. has decided to dissolve. As a result, I will have the pleasure of continuing to represent your interests as 'Of Counsel' with the law firm of McConn & Williams, L.L.P. . . . . I

am planning to take your files with me to my new firm. If you do not wish for me to take your files, please contact me as soon as possible so that we can make arrangements for you to take possession of them."

**4.** 267 S.W.3d 454.

**5.** 53 Tex.Sup.Ct.J. 758 (May 28, 2010).

decided by examining the contract as a whole in light of the circumstances present when the contract was entered.' "[6] One such circumstance is the existence of a lawyer-client relationship between the parties.[7] Because a lawyer's fiduciary duty to a client covers contract negotiations between them, such contracts are closely scrutinized.[8] Part of the lawyer's duty is to inform the client of all material facts.[9] And so that this responsibility is not a mere and meaningless formality, the lawyer must be clear.

Clarity in fee agreements is certainly important to clients. In an amicus brief supporting Anglo–Dutch, Professor Linda Eads explains:

> [Clients] need to know they can depend on the firm they thought they hired to represent their interests. When there is uncertainty about a firm's or attorney's responsibility for a matter, there is a real risk that loyalty to that client will become watery. And if disputes arise about fees or other issues, clients need to know who has ultimate authority to negotiate the issue, firm management or just the attorney working on the matter.[10]

Clarity is also important to lawyers. Professor Eads continues:

> Law firms need to know whether they are entitled to fees in order to budget their expenses and organizational strategy; firms need to know how much, and what scope of, malpractice insurance to purchase; they need to know who their clients are in order to analyze potential conflicts of interest; and firms need to know what matters are theirs in order to staff them appropriately and ensure their clients' interests are protected.
>
> &ast; &ast; &ast;
>
> [Individual] lawyers will want the certainty that their law firm stands behind them, that the firm's malpractice carrier will defend them if necessary, and that the fee agreements they draft will be interpreted to avoid readings that would involve violations of the rules of discipline. Further, in cases in which the existence of an ambiguity appears to

---

6. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 451 (Tex.2008) (per curiam) (quoting *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996)).

7. *See Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 560 (Tex.2006) ("When interpreting and enforcing attorney-client fee agreements, it is 'not enough to simply say that a contract is a contract. There are ethical considerations overlaying the contractual relationship.' " (quoting *Lopez v. Muñoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 868 (Tex.2000) (Gonzales, J., concurring and dissenting))).

8. *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 20 S.W.3d 692, 699 (Tex.2000) ("Contracts between attorneys and their clients negotiated during the existence of the attorney-client relationship are closely scrutinized."); *Archer v. Griffith*, 390 S.W.2d 735, 739 (Tex.1964) ("Although an attorney is not incapacitated from contracting with his client for compensation during the existence of the relation of attorney and client, and a fair and reasonable settlement of the compensation to be paid is valid and enforceable, if executed freely, voluntarily, and with full understanding by the client, the courts, because of the confidential relationship, scrutinize with jealousy all contracts between them for compensation which are made while the relation exists." (internal quotation marks omitted)); *see also* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 18, cmt. e (2000) ("Client-lawyer fee contracts entered into after the matter in question is under way are subject to special scrutiny....").

9. *Keck*, 20 S.W.3d at 699 (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 175 (Tex.1997)).

10. Brief of Amicus Curiae Linda S. Eads, Associate Professor of Law, Dedman School of Law, Southern Methodist University, in Support of Petitioner at 21.

favor the lawyer, allowing a lawyer initially to benefit from the ambiguity might not be a good thing, even for the lawyer. By suing a former client, the lawyer's reputation often suffers. And if the ambiguity was drafted by the lawyer, Texas courts will have to decide how to handle malpractice claims based on poor draftsmanship of the fee agreement.[11]

A number of law firms also appearing as amicus curiae endorse these views.[12]

■ Only reasonable clarity is required, not perfection; not every dispute over the contract's meaning must be resolved against the lawyer. But the object is that the client be informed, and thus whether the lawyer has been reasonably clear must be determined from the client's perspective. Accordingly, we agree with the *Restatement (Third) of the Law Governing Lawyers* that "[a] tribunal should construe a contract between client and lawyer as a reasonable person in the circumstances of the client would have construed it."[13]

■ Other circumstances surrounding the execution of a contract may inform its construction, but "[t]here are limits."[14] We have said:

An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports. Only where a contract is ambiguous may a court consider the parties' interpretation and "admit extraneous evidence to determine the true meaning of the instrument."[15]

Understanding the context in which an agreement was made is essential in determining the parties' intent *as expressed in the agreement*, but it is the parties' expressed intent that the court must determine. Extrinsic evidence cannot be used to show that the parties probably meant, or could have meant, something other than what their agreement stated.[16]

---

11. *Id.* at 20–21.

12. Brief of Amici Curiae Abrams Scott & Bickley, L.L.P., Arnold & Itkin LLP, Caddell & Chapman, Cornell, Smith & Mierl, LLP, Dawson, Sodd, Ellis & Hodge LLP, Law Office of James M. McCormack, and Quilling, Selander, Cummiskey & Lownds, P.C., in Support of Petitioner at 11–12. These firms describe themselves as follows: "Some ... are larger firms with multiple offices and dozens of attorneys practicing before the Texas bar; others are small firms with just a few attorneys. Some represent primarily defendants, some represent primarily plaintiffs, and some represent plaintiffs and defendants on a regular basis. The *amici curiae* are thus in a balanced position to address the interpretation of fee agreements between lawyers and their clients." *Id.* at 1.

13. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 18(2).

14. *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981) ("If, in the light

of surrounding circumstances, the language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing. Consideration of the facts and circumstances surrounding the execution of a contract, however, is simply an aid in the construction of the contract's language. There are limits.").

15. *David J. Sacks, P.C. v. Haden,* 266 S.W.3d 447, 450–451 (Tex.2008) (per curiam) (citation omitted) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995) (per curiam), and citing *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157 (1951)).

16. *See Gannon v. Baker,* 818 S.W.2d 754, 755–756 (Tex.1991) (per curiam) ("The parol evidence rule applies only to contractual or jural writings evidencing the creation, modification, termination or securing of a particular right or obligation. *Brannon v. Gulf States Energy Corp.,* 562 S.W.2d 219, 222 (Tex. 1977). The rule does not apply to mere statements or recitals of past facts.").

## B

■ On its face, the Fee Agreement is plainly one with Greenberg Peden, not Swonke personally. The clear indicia of the firm letterhead and signature on the firm's behalf are not contradicted by the personal pronouns in the text. Swonke's uses of "I", "me", and "my" indicate that he would himself be working on the matter, which Anglo–Dutch certainly intended, but none suggests that other attorneys and staff at Greenberg Peden would be excluded from the case any more than they had been from other Anglo–Dutch matters. Since the fee was contingent on recovery and therefore not based on any attorney's hourly rate, it would presumably make no difference to Anglo–Dutch who besides Swonke worked on the case as long as the fee was computed on his hours. One use of "I" clearly included the firm: "I will not be responsible for any expenses". The firm, not Swonke, invoiced the clients for expenses, on firm letterhead. Moreover, the second-person pronouns show that the word "you" refers sometimes only to Van Dyke individually ("you and/or the companies which you control"), sometimes only to Anglo–Dutch ("I would be entitled to receive from you"), and sometimes to Van Dyke and his companies ("you have executed" the McConn & Williams fee agreement—Van Dyke signing for his companies). In sum, the pronouns indicate only inexact drafting; none says that despite the firm letterhead and firm signature, the agreement could only have been with Swonke personally.

Nor does the fee calculation, based solely on the hours Swonke spent individually, suggest that others at Greenberg Peden were excluded from the work. Taking Swonke's time into account provided a way of limiting the fee. If anything, the rounding-up feature of the calculation might suggest a means of providing additional compensation for others who did work on the case. Anglo–Dutch was to reimburse expenses, which were billed by Greenberg Peden, not by Swonke individually.

Even if the Fee Agreement had expressly provided that only Swonke would render the legal services required, the representation could still have been a firm matter. Anglo–Dutch was already a Greenberg Peden client and had been for years. Although Swonke had first engaged Anglo–Dutch as a client and had been responsible for most of its work, Anglo–Dutch had never been Swonke's non-firm client. From Anglo–Dutch's perspective, nothing in the Fee Agreement reasonably suggested that its relationship with its lawyers was changing.

## C

■ The trial court having determined the Fee Agreement to be ambiguous, the parties offered extensive extrinsic evidence of their intent in the ten-day trial. Given our conclusion that the agreement was not ambiguous, this evidence is of limited relevance. It cannot be used to show the parties' motives or intentions apart from the Fee Agreement; it can only provide the context in which the agreement was reached.

Van Dyke was not an unsophisticated client; indeed, it was he, not Swonke, who proposed the terms of the Fee Agreement. But for years Anglo–Dutch had been a client of Greenberg Peden, not Swonke personally. Van Dyke knew Greenberg Peden was concerned that Anglo–Dutch was delinquent in its payments to the firm, but the Tenge Field representation was on a contingent-fee basis. He also knew that the firm had refused to be lead counsel in the case, but the firm certainly had sufficient resources for a consulting role. Nothing about the parties' relationship preceding the Fee Agreement required

Van Dyke to recognize that though the agreement purported to be with Greenberg Peden, it was really with Swonke.

Events following the Fee Agreement do not cast the situation in a different light. The day he signed the Fee Agreement for Anglo–Dutch, Van Dyke wrote Swonke that the agreement was with Greenberg Peden. When the firm dissolved a year later and Swonke moved to McConn & Williams, he treated all of Anglo–Dutch's files as having belonged to Greenberg Peden. Even after the Tenge Field case settled and the present controversy began to emerge, Swonke stated that he had signed the Fee Agreement on behalf of Greenberg Peden and obtained an assignment of its interest.

In sum, the circumstances in which the Fee Agreement was executed do not suggest that the parties must have intended something different from what they plainly stated. We hold that the agreement was between Anglo–Dutch and Greenberg Peden.

### III

 Construing client-lawyer agreements from the perspective of a reasonable client in the circumstances imposes a responsibility of clarity on the lawyer that should preclude a determination that an agreement is ambiguous in most instances. Lawyers appreciate the importance of words and "are more able than most clients to detect and repair omissions in client-lawyer contracts." [17] A client's best interests, which its lawyer is obliged to pursue, do not include having a jury construe their agreements.

The judgment of the court of appeals is reversed, and the case is remanded to the trial court for further proceedings.

Justice WAINWRIGHT filed an opinion concurring in part and dissenting in part.

Justice LEHRMANN filed a dissenting opinion, in which Justice MEDINA and Justice GREEN joined.

Justice WAINWRIGHT, concurring in part and dissenting in part.

Scott Van Dyke, president of Anglo–Dutch Petroleum International, Inc., and his attorney Gerald Swonke signed an engagement letter, dated October 16, 2000, in which attorney Swonke agreed to represent Van Dyke's company, Anglo–Dutch, in litigation with Halliburton Energy Services, Inc. Swonke was "of counsel" at the law firm of Greenberg Peden P.C. Anglo–Dutch contends that under the terms of the letter, Swonke also bound Greenberg Peden to represent Anglo–Dutch in the Halliburton litigation. The letter contains Swonke's references to expenses he would "personally incur", fees that "I would be entitled to receive", the agreement for "me" to assist you in the so-called Halliburton litigation, but it is drafted on Greenberg Peden letterhead. Swonke contends this was an oversight. Swonke testified that for a couple of years prior to the Halliburton litigation, he had individually represented Anglo–Dutch under his "of counsel" arrangement at Greenberg Peden. Notwithstanding this evidence, the Court disagrees with the trial court and concludes that the engagement letter is unambiguous and as a matter of law bound the Greenberg Peden firm to represent Anglo–Dutch. I therefore agree with JUSTICE LEHRMANN'S dissent that the engagement letter is ambiguous and with her other departures from the Court's opinion. I write to explain another basis for my disagreement with the Court's position.

**17.** Restatement (Third) of the Law Governing Lawyers § 18 cmt. h.

The Court holds the two parties to an agreement that neither of them entered in October 2000, as their trial testimony indicates. Van Dyke testified that he knew at the time of the engagement letter that Greenberg Peden would not represent Anglo–Dutch in any new matters, such as the Halliburton litigation. Why? Van Dyke explained. Anglo–Dutch was over $200,000 behind in paying Greenberg Peden, and Greenberg Peden was not interested in further exposure on contingency fee cases. The exchange on this point during Van Dyke's testimony at trial is unequivocal, as Swonke told him in February 2000 that Greenberg Peden was not his law firm.

> Attorney: Mr. Van Dyke, my question was a more limited one, and you can say, "No, he didn't tell me that," if you want.
>
> I'm just asking: Did he [Swonke] not tell you from the beginning that Greenberg Peden wouldn't represent you in any lawsuit here, no matter whether it was contingency or hourly at all until you—because you hadn't paid off that debt.
>
> Van Dyke: Yes.

Furthermore, Van Dyke knew that no Greenberg lawyers would work on his files from that time forward. Harlan Naylor, Greenberg's managing partner, explained to the jury that the firm's lawyers were instructed not to work for Anglo–Dutch— "neither the shareholders nor the associates were going to do any more work for Mr. Van Dyke on that case." This testimony from Van Dyke and Naylor is undisputed. Swonke explained to the jury that Greenberg had essentially terminated Van Dyke as a client.

> Greenberg Peden had told him in my presence they wouldn't do any more work for him. I had been doing work for him individually in my own capacity

for—I don't know—two years, with Greenberg Peden not having involvement at all.

The uncontested testimony at trial establishes that Greenberg Peden's name partner (David Peden) told Van Dyke before he signed the engagement letter that the Greenberg Peden firm would not represent Anglo–Dutch in any new matter, whether contingency or hourly, because it was delinquent in paying the firm over $200,000 in legal fees. Swonke was present at that meeting. Nevertheless, Anglo–Dutch contends that the engagement letter signed after the meeting bound Greenberg Peden to represent it in the Halliburton litigation. This is quite a turnabout for Anglo–Dutch as its litigation position contradicts the knowledge of its president, who signed the engagement letter. Knowing that Greenberg Peden refused to represent Anglo–Dutch in the Halliburton litigation, Van Dyke now asserts that the engagement letter unambiguously did just that.

The jury heard all about the dispute from all four sides—Swonke, Van Dyke, Greenberg Peden and another law firm Anglo–Dutch engaged (McConn & Williams)—and found that the two signers of the engagement letter intended that Swonke, not Greenberg Peden, would represent Anglo–Dutch.

I agree with the Court that attorneys owe fiduciary duties to their clients in this context that include: exercising the utmost good faith and most scrupulous honesty toward clients; ensuring that engagement letters are clear to the clients; fully and fairly disclosing all important information to clients concerning the transactions; and explaining material changes in the arrangement, such as moving from one law firm to another. Ambiguity in the fee agreement should be construed against the lawyer-drafter of the agreement. The

Court and amici set these duties out in some detail.[1] I do not conclude, however, that application of these duties to this case means that an ambiguous contract should be designated clear and then enforced to a result that neither signer intended at the time he signed it. At base, our task here is to enforce the parties' agreement. The duties and presumptions of counsel in such cases should help determine what the contractual obligations are, not override the agreement they entered.

I therefore agree with the arguments in JUSTICE LEHRMANN's dissent. However, because I agree that the judgment should remand the case to the trial court, I concur in the Court's judgment, while respectfully dissenting from its reasoning. Unlike the Court, I would remand for a new trial and instruct the jury to be guided by the lawyer's fiduciary duties in interpreting the ambiguous engagement letter.

Justice LEHRMANN, joined by Justice MEDINA, and Justice GREEN, dissenting.

I agree that a court should review an attorney-client agreement from the perspective of a reasonable person in the client's circumstances when deciding whether it is subject to two or more reasonable interpretations. I disagree, however, with the Court's assumption that an agreement on firm letterhead unambiguously creates an agreement with the firm. The use of letterhead must be viewed in light of clear evidence that the client understood the firm had refused to represent him in the case due to large unpaid legal bills, the lawyer's testimony that his secretary mistakenly used firm stationery, and the fact that the agreement referred solely to the individual lawyer and contemplated a fee structure where only that lawyer's time would be compensated. I therefore am compelled to respectfully express my dissent. I would affirm the court of appeals' judgment and hold that the trial court correctly determined the agreement was ambiguous and properly submitted the agreement's meaning to the jury.

## I. BACKGROUND

Scott Van Dyke, the president of Anglo–Dutch, and Swonke, the attorney, had a long-standing relationship that began when Van Dyke worked at another company. Swonke was "of counsel" at the law firm of Greenberg Peden when the subject agreement was executed in 2000. One of the firm's founders testified at trial that Greenberg Peden understood Swonke sometimes contracted with clients the firm did not want to represent, and it was understood these were Swonke's "side deals". Greenberg Peden had the right of first refusal for all of Swonke's potential clients.

In 1997, when Anglo–Dutch committed to develop an oil field in Kazakhstan with two business partners, Halliburton and Ramco, Van Dyke contacted Swonke to prepare the necessary documents. It is undisputed that the parties understood that Greenberg Peden, not Swonke individually, took on the representation at that time. No formal fee agreement was signed. The joint project ended in early 2000 when Halliburton and Ramco alleged-

---

1. *See* Brief of Amicus Curiae Linda S. Eads, Associate Professor of Law, Dedman School of Law, Southern Methodist University, in Support of Petitioner at 21. *See* Brief of Amici Curiae Abrams Scott & Bickley, L.L.P., Arnold & Itkin LLP, Caddell & Chapman, Cornell, Smith & Mierl, LLP, Dawson, Sodd, Ellis & Hodge LLP, Law Office of James M. McCormack, and Quilling, Selander, Cummiskey & Lownds, P.C., in Support of Petitioner. The law firm *amici* state that they "are not suggesting that lawyers and law firms should always lose a fee dispute." *Id.* at 8.

ly breached the parties' confidentiality agreement and disclosed Anglo–Dutch's confidential data to third parties. Van Dyke consulted with Swonke, who advised him that Anglo–Dutch had viable claims against Halliburton and Ramco.

Around the same time, Anglo–Dutch ceased paying Greenberg Peden's bills and began accumulating a large account payable to the firm. Anglo–Dutch's unpaid legal bills prompted Greenberg Peden to stop working for Anglo–Dutch in 1999. By early 2000, Anglo–Dutch owed Greenberg Peden more than $200,000. It is undisputed that Van Dyke asked if Greenberg Peden would represent Anglo–Dutch in the lawsuit against Ramco and Halliburton, but the firm refused to take on any more work for Anglo–Dutch because of Anglo–Dutch's unpaid bills and a history of difficulty in collecting fees from Anglo–Dutch.

Unable to retain Greenberg Peden, Anglo–Dutch, based on Swonke's recommendation, hired the law firm of McConn & Williams under a twenty percent contingency fee arrangement. As the Halliburton lawsuit progressed, Van Dyke asked Swonke to serve as an advisor to McConn & Williams because of his familiarity with the underlying contracts. After initially consulting for free, Swonke requested compensation as his involvement in the case became more substantial. McConn & Williams declined to pay Swonke because the firm's contingency fee interest was not large enough, so Van Dyke called Swonke directly and offered to pay him for the work. It is undisputed that Van Dyke and Swonke negotiated the terms of Swonke's representation and that Swonke finally agreed to accept compensation in the form of a fraction of the total recovery calculated based on the hours he worked, divided by the total hours billed by the McConn & Williams attorneys.

Swonke dictated the body of the one-page agreement and his secretary printed it on Greenberg Peden letterhead, with a Greenberg Peden signature block. Swonke signed his name under the Greenberg Peden signature block and sent the agreement to Van Dyke, who signed and returned it the next day. Swonke testified he did not notice the letterhead or the signature block and did not think to correct them at any point because he and Van Dyke both knew the agreement was personal to him.

The day he signed the agreement, Van Dyke also drafted and sent Swonke a separate transmittal letter attaching a copy of the McConn & Williams contingency fee agreement. The letter said that the McConn & Williams document "provides the basis for the Agreement between Greenberg Peden P.C. and Anglo–Dutch." At trial, Swonke questioned Van Dyke's motives for sending the letter separately from the main agreement, and for sending it at all as Van Dyke had previously given him the McConn & Williams agreement. Swonke testified that he did not read the letter, and would not normally read a transmittal letter referring to a document he already had in his files.

Swonke worked on the Halliburton lawsuit for 277 hours while at Greenberg Peden. After Greenberg Peden dissolved in 2001, Swonke joined McConn & Williams as "of counsel". McConn & Williams and Swonke agreed that he would not share in the firm's fees from the Halliburton lawsuit, but did not relay that agreement to Anglo–Dutch. Swonke did inform Anglo–Dutch of his move to McConn & Williams, and told Anglo–Dutch he planned to take his client files with him unless Anglo–Dutch objected. Receiving no objection, Swonke worked 1,022 hours on the matter at McConn & Williams.

Anglo–Dutch won a $70.5 million verdict against Halliburton and the parties stipulated to $9.8 million in attorney's fees. The verdict was appealed and Halliburton ultimately settled the case for $51 million in 2004. A few days before Halliburton was going to wire the attorneys' fees portion of the settlement to individuals and firms involved in the case, Swonke's name was removed from the wiring instructions at Van Dyke's request. Noting the change, Swonke e-mailed Van Dyke asking how he wanted to handle his compensation. Prior to discussing payment, Van Dyke requested that Greenberg Peden assign any interest under the Anglo–Dutch agreement to Swonke, purportedly to avoid any possible problems with multiple claims for attorney's fees. Swonke contacted Greenberg Peden, and the no-longer operating firm's representatives agreed to the assignment in exchange for a ten percent fee from all amounts collected by Swonke from Anglo–Dutch, an amount consistent with their original agreement that he would pay the firm a flat ten percent to cover overhead for matters handled by Swonke individually.

Soon after obtaining the assignment letter, Van Dyke informed Swonke that he'd consulted lawyers and determined that Anglo–Dutch's contract was with Greenberg Peden and not with Swonke individually. Accordingly, Van Dyke refused to include the hours billed after Swonke left Greenberg Peden in the contingency ratio, a position that would reduce Swonke's total compensation due by over a million dollars. Swonke asserted that the agreement was personal to him and that he should be paid for all of the work he performed for Anglo–Dutch. It is undisputed that had the trial court determined that the agreement was with Greenberg Peden, Anglo–Dutch would be able to calculate the compensation ratio based solely on the 277 hours Swonke billed while at Greenberg Peden.

Anglo–Dutch argued that the 1,022 hours Swonke billed at McConn & Williams were covered by that firm's contingency percentage.

## II. APPLICABLE STANDARDS

I agree with the standards the Court applies in determining whether this attorney-client agreement is ambiguous. Ambiguity is determined by examining the contract as a whole in light of the circumstances present when the contract was entered. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996). When an agreement's language is ambiguous in light of the circumstances present when the parties entered into it, its meaning becomes an issue for the fact-finder. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex.2003); *see Columbia Gas*, 940 S.W.2d at 589.

I also agree that there are limits. *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex.1981). Parol evidence will not be received to create an ambiguity or to give a contract a meaning different from that imparted by its language. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450–51 (Tex.2008) (citations omitted). Courts may not consider the parties' interpretation or "admit extraneous evidence to determine the true meaning of the instrument" if the express language of the agreement may be interpreted in only one way. *Id.* at 450 (quoting *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995)). Ambiguity likewise does not arise simply because the parties advance conflicting interpretations of the contract; rather, for an ambiguity to exist, both interpretations must be reasonable. *See Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 866 (Tex.2000); *Nat'l Union Fire Ins.*, 907 S.W.2d at 520.

Further, as the Court observes and Anglo–Dutch and amici[1] contend, clarity is obviously critical, and courts should therefore view the agreement from the perspective of a reasonable client to determine if it is susceptible to more than one reasonable interpretation. Such a rule will protect clients from unscrupulous attorneys, reduce disputes, and create a predictable rule that is in the best interest of the legal system, individual clients, lawyers, and law firms.

And it is beyond dispute that attorney-client agreements are subject to heightened scrutiny by the courts because of the fiduciary nature of the attorney-client relationship. *See Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 560 (Tex.2006). The attorney, unlike a commercial party to an agreement, bears a duty to ensure the client understands the terms of the representation because of the trust the client places in the attorney. *See Levine v. Bayne, Snell & Krause, Ltd.*, 40 S.W.3d 92, 95 (Tex.2001). To fulfill this duty, the lawyer must be clear.

Like the Court, I believe that the approach set out in the Restatement of the Law Governing Lawyers is workable. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 18, cmt. h. Under this approach, such agreements should be viewed from the perspective of a reasonable client, taking into consideration the parties' relative bargaining power and other circumstances surrounding the agreement. *See id.* A reasonable client to whom this standard is applied is "a reasonable person in the client's circumstances." *Id.* I do not agree, however, that any potential ambigu-

ities should be resolved against the attorney.

## III. ASSESSING AMBIGUITY IN ATTORNEY–CLIENT AGREEMENTS

The evaluation of whether an agreement is subject to multiple reasonable interpretations should be made from the perspective of a reasonable person in the client's circumstances. This does not mean, as Anglo–Dutch and the Court presume, that the individual client's interpretation prevails. Instead, the reasonableness of potential interpretations will be viewed from the reasonable client's perspective, taking into consideration the circumstances surrounding the agreement's formation, such as the parties' past dealings, their relative bargaining power, and the client's experience negotiating such agreements to determine whether the agreement was "truly negotiated". *See id.* If the court determines, as a matter of law, that the agreement is subject to more than one reasonable interpretation from a reasonable client's perspective, construction of the agreement becomes a fact issue for the judge or jury to resolve.

The Court claims not to construe the agreement against the attorney. *See Levine*, 40 S.W.3d at 94; *Lopez*, 22 S.W.3d at 860–61. However, in concluding that the circumstances surrounding the agreement do nothing to negate the letterhead on which the agreement was printed, the Court does just that. The Restatement emphasizes that in applying the reasonable client standard, courts should not ignore "the usual resources of contractual interpretation such as the language of the contract, the circumstances in which it was

---

1. Two amicus briefs were submitted in support of Anglo–Dutch: one by Linda Eads, Associate Professor of Law at the Dedman School of Law and another by the law firms of Abrams Scott & Bickley, L.L.P.; Arnold & Itkin LLP; Caddell & Chapman; Cornell, Smith & Mierl, LLP; Dawson, Sodd, Ellis & Hodge LLP; Law Office of James M. McCormack; and Quilling, Selander, Cummiskey & Lownds, P.C.

made, and the client's sophistication and experience in retaining and compensating lawyers or lack thereof." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 18, cmt. h. An agreement should be "construed in light of the circumstances in which it was made, the parties' past practice and contracts, and whether it was truly negotiated." *Id.*

Undoubtedly, Swonke's use of the Greenberg Peden letterhead in this case contributed to the agreement's ambiguity. But in times of increasing fluidity in the legal profession, the solution the Court implements—to construe agreements based on the letterhead regardless of the parties' understanding of their terms—could lead to unnecessarily harsh results: a lawyer who made a mistake in choosing stationery—or even used the only stationery available—would lose. *See* Milton C. Regan, Jr. & Palmer T. Heenan, *Supply Chains and Porous Boundaries: The Disaggregation of Legal Services*, 78 FORDHAM L.REV. 2137, 2191 (2010) (noting that the economic downturn marks a "transition for law firms less because of its immediate financial impact and more because it has highlighted and accelerated the trend toward the disaggregation of legal services that had begun before it"). While the entire Court would hold lawyers to a standard of reasonable clarity, perfection is not required. The Court's analysis of the agreement should focus on the terms as negotiated and agreed to, not on interpretations that the parties (and, at times, their counsel) have subsequently adopted in light of the changed circumstances. While giving due weight to a lawyer's fiduciary obligations, we should do so from a reasonable, not predatory, client's perspective.

## 1. Reasonableness of alternative interpretations

The Court holds that, even applying the Restatement's approach, a reasonable client would only interpret the agreement to be with Greenberg Peden. I disagree with that mechanical approach: application of the factors outlined in the Restatement leads me to conclude that the agreement is subject to multiple reasonable interpretations under the circumstances and thus ambiguous. The express terms of the Anglo–Dutch agreement cast doubt that it could only be understood to form a contract with Greenberg Peden from a reasonable client's perspective.

The Anglo–Dutch agreement invites more than one reasonable interpretation of the parties' intentions in spite of the fact that it was printed on Greenberg Peden letterhead and signed under a Greenberg Peden signature block. First, the body of the agreement did not reference Greenberg Peden while it referred to McConn & Williams by name five separate times. It defined the client as "you and/or the companies which you control (Anglo–Dutch)" but exclusively used personal pronouns throughout to refer to Swonke. The one-page document repeatedly used language such as "I agree to assist Anglo–Dutch and [McConn & Williams] for proportionately the same percentage (20%) of any benefit to McConn & Williams;" "the proportions under which my fees shall be calculated will be the ratio of the hours I have spent . . . relative to the hours [of McConn & Williams attorneys];" "if . . . I spent 90 hours of my time towards the lawsuit, . . . I would be entitled to receive;" "I shall be entitled to the benefit of any amendment;" "I will not be responsible for any expenses other than those I may personally incur;" and the like.

Second, the fee structure contemplated by Anglo–Dutch and Swonke, which based Swonke's compensation solely on the hours he individually billed, creates an ambigui-

ty, especially when compared to other firm fee agreements. The applicable provision states that:

the proportions under which my fees shall be calculated will be the ratio of the hours I have spent or will spend on this matter relative to the hours the attorneys at McConn & Williams have spent or will spend after the date the lawsuit was filed, rounded to the next whole percentage.

The four corners of the Anglo–Dutch agreement indicate that Anglo–Dutch and Swonke negotiated a contingency fee based solely on the hours Swonke (and no other Greenberg Peden attorneys or support staff) worked on the lawsuit, divided by the total hours billed by "the attorneys at McConn & Williams."[2] It is helpful to contrast this fee structure with the structure of the law firm agreement in *Sacks*, which likewise contained personal pronouns:

My ... rate for this particular matter will be $200.00 per hour. The other lawyers in my firm range from $150.00 to $200.00 per hour, and paralegals range from $50.00 to $100.00 per hour. You are responsible for all costs and expenses in the case as incurred. These expenses include, but are not limited to, copies; binding; fax transmissions; travel; lodging; parking; etc.

*Sacks*, 266 S.W.3d at 448–49.

While the Anglo–Dutch agreement stated Swonke would not be responsible for expenses, it did not anticipate compensation beyond one attorney's billable hours. *Compare Anglo–Dutch*, 267 S.W.3d at 460–61 *with Sacks*, 266 S.W.3d at 448–49; *In re Inslaw, Inc.*, 97 B.R. 685, 688 (Bankr. D.D.C.1989) (discussing an hourly law firm agreement stating that "[m]y partner ...

will be billed at $170 and all other attorney or paralegal time will be billed at this law firm's normal rate for that person"); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 586 F.Supp.2d 732, 767 and n. 32 (S.D.Tex. 2008) (recognizing that law firm contingent fees take resources into account by holding that "in light of the complexity and difficulty of the litigation, the fee percentage would have to be sufficient to create adequate incentives for the firm to dedicate the substantial resources, possibly over a long period of time"). The agreement's compensation ratio and the use of personal pronouns throughout, in conjunction with its use of Greenberg Peden letterhead and the Greenberg Peden signature block, make it open to more than one reasonable interpretation. Accordingly, it must be read in light of surrounding circumstances. *See Columbia Gas*, 940 S.W.2d at 589; *Sun Oil*, 626 S.W.2d at 731.

**2. Circumstances surrounding the agreement**

It is undisputed that Van Dyke knew Greenberg Peden had refused to represent Anglo–Dutch in the Halliburton lawsuit due to the large amount of unpaid legal bills and the history of difficulty in collecting fees from Anglo–Dutch. Van Dyke admitted that he knew that Anglo–Dutch's account payable exceeded $200,000, and that Greenberg Peden therefore wanted to play no part in the lawsuit against Halliburton. Given this admission, it is difficult to see how a reasonable client in Anglo–Dutch's position could have believed that the agreement was with the firm, rather than with Swonke.

Moreover, it is undisputed that the contract in this case arose in the context of genuine negotiations between Swonke and the client, both of whom had previous ex-

---

**2.** Anglo–Dutch's agreement with McConn & Williams provided for a flat 20 percent con- tingency fee, later reduced to 16 and 2/3 per- cent.

perience negotiating such agreements. Van Dyke testified that negotiating agreements was a significant portion of his job. He testified that Anglo–Dutch retained other counsel prior to switching to Greenberg Peden and had another attorney draft a demand letter to Halliburton prior to retaining McConn & Williams. Further, Van Dyke testified that he and Swonke had many discussions about contract drafting over the years, and Swonke had even given Van Dyke advice on best practices when drafting agreements.

Concerns that an attorney could exercise undue influence over an existing client are valid, but they are minimized here because this agreement was truly negotiated. The agreement was not suggested by Swonke to an uninformed and agreeable client—to the contrary, Van Dyke proposed it to ensure that he would continue to receive the benefit of Swonke's experience when McConn & Williams refused to compensate Swonke for his services. Although the Anglo–Dutch agreement is only one page, both Van Dyke and Swonke testified that they negotiated its terms. Significantly, there is undisputed evidence that Van Dyke, not Swonke, suggested the unusual compensation ratio that Swonke initially resisted, requesting a flat percentage fee instead.

Viewing the agreement from a reasonable client's perspective, I disagree that Anglo–Dutch's interpretation is the only reasonable one. Certainly, the use of personal pronouns in an engagement letter does not alone create an ambiguity as to whether the client hired a law firm or an individual lawyer. To be reasonable, an alternative interpretation must be one a client could reasonably understand from the agreement's language and the circumstances of the negotiation between the parties. Yet the negotiations between the parties demonstrate an understanding that

the law firm of Greenberg Peden was uninterested in future work for Anglo–Dutch, and Swonke negotiated the compensation for himself individually. The Court is persuaded by the letterhead on which the agreement was printed after its terms were already negotiated and accepted by both parties, and by the language of a Greenberg Peden assignment of interest letter, signed years after the agreement was reached. Neither one bears on the parties' understanding at the time they reached their agreement.

I would hold that the language of the agreement, as shown by the compensation ratio, the use of personal pronouns, the use of Greenberg Peden letterhead and the Greenberg Peden signature block, together with the circumstances surrounding the agreement's formation, made it open to multiple interpretations. The use of the letterhead could lead a reasonable client to believe the agreement was with the law firm. However, it was every bit as reasonable, given Greenberg Peden's repeated refusal to do more business with Anglo–Dutch, for the client to understand that it was a personal agreement with Swonke. Van Dyke's undisputed testimony that the firm declined all further representation of Anglo–Dutch highlights the ambiguity resulting from the circumstances surrounding the agreement's formation. His one-paragraph letter to Swonke, describing it as the agreement between "Anglo–Dutch and Greenberg Peden," showed only Anglo–Dutch's self-serving interpretation of the agreement, not whether it would unmistakably be understood that way by a reasonable client given the scope of the agreement. Moreover, because the letter is external to the contract's formation, it is not properly considered in determining whether the agreement is ambiguous.

Consideration of the language of the actual contract and the circumstances sur-

rounding its formation lead me to conclude that the fee agreement was ambiguous as a matter of law. Accordingly, I would hold that the trial court properly submitted the agreement's construction to the jury. Because the Court effectively construes the agreement against the lawyer, I am compelled to respectfully express my dissent.

